[686 NYS2d 396]

In the Matter of A.G., a Child Alleged to be Neglected and/or Abused. H.G., Respondent-Appellant; COMMISSIONER OF THE ADMINISTRATION FOR CHILDREN'S SERVICES OF THE CITY OF NEW YORK, Appellant-Respondent.

First Department, March 4, 1999

APPEARANCES OF COUNSEL

*Raymond E. Rogers* of counsel (*Ronald Richter* on the brief; *Monica Drinane, Legal Aid Society,* Juvenile Rights Division), *Law Guardian* for infant.

*Alan Beckoff* of counsel (*Stephen J. McGrath* on the brief; *Michael D. Hess, Corporation Counsel* of New York City, attorney), for appellant-respondent.

*Robert Z. Dobrish* of counsel (*Stanley Kallman, Robert H. Moses* and *Lydia A. Milone* on the brief; *Hoffinger Friedland Dobrish & Stern, P. C.,* attorneys), for respondent-appellant.

### OPINION OF THE COURT

SAXE, J.

In this child protective proceeding, the petitioner Administration for Children's Services (ACS) challenges the Family Court's rejection of its claim of sexual abuse committed by the respondent father, and respondent challenges the court's finding of neglect, which charge was added by the court by *sua sponte* amendment of the petition. We affirm both the court's rejection of the sexual abuse charge and its affirmative finding

of neglect, but modify so as to impose supervision obligations in the interest of protecting the child from further potentially damaging conduct.

Respondent H.G. is a 61-year-old businessman. A.G. is respondent's daughter from his third marriage, which ended when A.G. was two years old; she was four years old at the time of the petition. Respondent also has three grown children from his first marriage, and a teenaged daughter from his second marriage.

The investigation begun by ACS was initially based upon charges made by a former employee of respondent's company. This employee indicated in her report to the police that she had observed respondent touching and rubbing A.G.'s vagina on several occasions, and that A.G. told her that she licks her father's penis and buttocks, as well as his face, neck and chest. She also reported having heard respondent say on the telephone, with respect to A.G., "I have this dripping, gorgeous, wet, naked girl here standing in front of me, and I just want to lick her and eat her up, and she's turning me on * * * and she's four years old." The court ultimately rejected this employee's credibility, based upon her demeanor and affect, and the fact that she did not report her purported observations until many weeks after the events. Further, the timing of her report coincided with her consultation with an attorney and decision to file a sexual harassment complaint against respondent, based upon his alleged conduct toward her during her employment. Although the court properly rejected her testimony, the ACS investigation resulted in additional troubling testimony which was brought out at trial.

The only other testimony describing a witness's direct observation of physical contact between respondent and A.G. was that of a former housekeeper for respondent, who testified that respondent and A.G. frequently slept in the same bed, sometimes wholly or partially nude, and that on two occasions she had observed A.G., asleep, with her hand on respondent's penis. She also testified that respondent sometimes walked around his house while nude.

Since the Family Court found that the testimony of this former housekeeper did not prove the charge of sex abuse, it then looked to the remaining evidence, relating out-of-court statements by A.G. to others, observations by others of her conduct, and testimony regarding respondent's conduct.

Dr. April Kuchuk was the expert selected by ACS to be the validator in the case. After conducting five interviews with

A.G., as well as speaking with respondent, C.G. (A.G.'s mother), C.G.'s new husband, respondent's other children, respondent's housekeeper, and Detective Tacchi, the police detective who served as chief investigator for ACS, Dr. Kuchuk concluded that the child had not been sexually abused.

Detective Joan Determan, who interviewed A.G. one afternoon shortly after the report of suspected abuse was filed, testified that in the interview A.G. told her that she sometimes touches her father's penis in the bath and that she licks his penis. While the court found Detective Determan to be credible, it questioned the reliability of her information, in particular the reported statement about licking her father's penis.

The court did not fully accept Dr. Kuchuk's criticism of the detective's interviewing techniques, nor did the court accept the expert's conclusion that the child's statement about licking her father's penis must have been elicited with a very suggestive or intimidating line of questioning, or obtained by a mere nod or one-word agreement to a very directive question. Nevertheless, the court emphasized that the detective was unable to recreate the question that had elicited A.G.'s reported statement about licking respondent's penis. Accordingly, the court discounted that aspect of the detective's recounting of A.G.'s out-of-court statements.

It is undisputed that respondent bathed nude with A.G. throughout her first few years. At some point C.G. requested, and a psychiatrist recommended, that respondent cease this practice. Respondent had agreed to wear a bathing suit or underwear while in the tub with A.G., but he admitted that he was "not conscientious" about it. Indeed, another former housekeeper for respondent testified that respondent told her he wasn't going to do so. A.G. told Dr. Kuchuk that she had touched respondent's penis while in the bath with him, but that respondent told her not to. While respondent did not concede that A.G. touched his penis, he admitted on the stand that it could have happened.

This second former housekeeper also testified that she had heard respondent on several occasions describe A.G. as sexy, or say, "Look how sexy she looks."

A.G.'s mother, C.G., and her new husband testified that during the summer of 1996, A.G. began to masturbate with some frequency when around her family, in an obvious and extreme manner, taking off her clothes and spreading her legs. During the same period she also began licking her mother's face, neck, and shoulder. When asked about her behavior, A.G. replied, "I lick daddy's beard."

A number of troubling out-of-court statements by A.G. were reported by her mother and her new stepfather, although it is noteworthy that almost all of them occurred after the investigation into the sexual abuse report had begun. Both C.G. and her husband testified to an incident when their family was on the bed watching a video, and A.G. started to push her foot to her stepfather's crotch and said "I want to rub his penis." When asked why, she said, "I do that with my daddy, but I use my hand with my daddy."

In another instance, in February 1997, A.G. and her baby half-brother were taking a bath, and A.G. put the baby's foot on her vagina and said, "It feels good." When C.G. asked how she knew it felt good, she said "Daddy used to do this."

On another occasion, soon after the initial report of abuse and A.G.'s interview with Detective Determan, C.G. testified, A.G. asked her mother to "touch my vagina like Daddy does." C.G. asked A.G. to show her how her Daddy did it, and the spot A.G. indicated was not the vagina, but the pubic area below her abdomen. However, the court noted that A.G. clearly knew where her vagina was. It also noted the established fact that when A.G. experienced vaginal irritation, both parents had on occasion touched the area in the process of easing the irritation.

A.G.'s stepfather also testified that once in October 1996, when he went to give A.G. a kiss hello after work, A.G. asked for a "tongue kiss," and stuck out her tongue. When asked where she learned to tongue kiss, she said "My dad." When C.G. came in and asked A.G. "Your dad tongue-kissed with you?" A.G. said "No, [C.B.], my niece taught me this." C.B. is six years old, and is one of respondent's grandchildren. Other evidence confirmed both that A.G. and C.B. touched the tips of their tongues when kissing, and that respondent and A.G. sometimes touched the tips of their tongues when kissing or in a game in which he asks her to eat Cheerios off the tip of his tongue.

A.G.'s stepfather testified as to several other out-of-court statements by A.G. In one, when riding on his shoulders in mid-December 1996, she said that sitting on his ponytail felt like she was sitting on his penis. When asked how she knew it felt like a penis, she said "Never mind, never mind." On another occasion she told her stepfather that he was not allowed to see her vagina, that only her father was allowed to see her vagina.

Also according to C.G. and her husband, in a telephone conversation between respondent and A.G., upon hearing that

A.G. had just been taking a bath with her baby brother, respondent asked A.G. whether her stepfather had seen her naked. This implicit insistence by respondent on his exclusive right to see A.G. naked was also demonstrated, according to testimony by the stepfather, when A.G., while getting dressed, told her stepfather, "You can't be in here because I am going to be naked and my daddy says you can't see my vagina, only he can see it."

Also introduced into evidence was a picture of her father drawn by A.G. in school in about March of 1997. A.G. told her mother, "This is my daddy with his big big belly. And this is his penis."

Finally, respondent's daughter J.G., then 19, testified about a trip to Mexico with respondent when she was approximately 15. She said she walked into her father's hotel room, dressed for dinner, and he was naked on the bed; he covered himself with a nearby sombrero. J.G. asked her father to take her photograph, and after he did so he asked J.G. to take a photograph of him. Respondent then removed the sombrero and asked J.G. to photograph him like that.

The court found J.G. to be extremely uncomfortable while testifying; further, the court concluded that J.G. was attempting to protect respondent by portraying the event as a lark, and attributing the initiation of the photo session to herself rather than respondent.

Further regarding J.G., there was testimony that respondent continued to bathe nude with her well into her preteen years, and that respondent kept topless photographs of J.G. in his bedroom, one taken at age 11 and another taken when she was an older teenager.

The Family Court's findings regarding the respondent's conduct with the child, which findings we do not disturb, are as follows:

1. respondent continued to bathe nude with his daughter after the child's mother asked him not to and a counselor advised him not to, and although his daughter touched his penis and his foot rubbed against his daughter's vagina in the bath;

2. respondent continued to sleep nude with his daughter after the two were found asleep with the child's hand on his penis and her face in the area of his crotch;

3. respondent had his daughter sit on his nude belly in the bath;

4. respondent caused his daughter to have an inordinate amount of viewing of his nude body, including his penis;

5. he encouraged his daughter to touch her tongue to his tongue when kissing;

6. he urinated in his daughter's presence when the child was three years old;

7. he described his daughter as "sexy" in her presence;

8. he questioned his daughter about whether her stepfather sees her naked in the bathtub.

■ Based upon the foregoing facts, the Family Court properly determined that ACS failed to establish sexual abuse within the meaning of Family Court Act § 1012 (e) (iii) by a preponderance of the evidence (*see, Matter of Tammie Z.*, 66 NY2d 1; *see also, Matter of Patricia J.*, 206 AD2d 847, *lv denied* 84 NY2d 810; *Matter of Anna B.*, 185 AD2d 311, 312).

In order to make a determination of sexual abuse (Penal Law § 130.65; Family Ct Act § 1012 [e] [iii]), the court must find that the respondent subjected a child under the age of 11 to "sexual contact", which has been described as " 'any touching of the sexual or other intimate parts of a person' " (*People v Teicher*, 52 NY2d 638, 646). Where the petitioner relies upon out-of-court hearsay statements reportedly made by the child to others, such evidence must be corroborated (*see,* Family Ct Act § 1046 [a] [vi]). Such corroboration *may* be provided by the validation testimony of an expert, whose conclusion may be based in part upon the manifestation of "age-inappropriate knowledge of sexual behavior" (*Matter of Nicole V.*, 71 NY2d 112, 121).

Petitioner contends that because the court found that the child had engaged in what it termed sexually imitative behavior, it must necessarily find that behavior to be correlative of the out-of-court statements reported to have been made by the child, and must therefore conclude that sexual abuse was demonstrated. However, once the court had rejected the testimony of respondent's former employee who had purportedly witnessed incidents of sexual abuse, and discounted that of the detective who interviewed the child, the remaining out-of-court statements provided little, if any, support for a conclusion of sexual abuse. The required corroboration for the child's reported comments to her mother and stepfather concerning touching or rubbing her father's penis, or about his touching her vagina, all of which comments were made after a number of investigators had repeatedly asked her direct questions about such conduct, is not, in these circumstances, provided by the child's extensive masturbatory conduct or excessive focus on genitals.

Indeed, the behavior characterized by the Family Court as sexually imitative is in our view best understood as a reflection of the extent to which the respondent overexposed his child to excessive nudity and overemphasized awareness of their bodies when he was with her.

Furthermore, to qualify as sexual contact for purposes of Penal Law § 130.65 and Family Court Act § 1012 (e) (iii), the touching must be for the purpose of gratifying sexual desire (*see, People v Teicher*, 52 NY2d 638, 646-647, *supra*; *Matter of Patricia J.*, 206 AD2d 847, *supra*). Although such a purpose *may* be inferred from the nature of certain acts themselves, respondent's conduct, as found by the trial court, does not give rise to such an inference.

It is clearly appropriate to infer sexual gratification from the conduct alone when a nonrelative causes intimate contact with a child (*see, e.g., People v Estela*, 136 AD2d 728, *lv denied* 71 NY2d 895; *People v Farren*, 178 AD2d 913; *see also, Matter of David V.*, 226 AD2d 319; *People v Watson*, 171 AD2d 826, *lv denied* 78 NY2d 1015). However, when the challenged conduct is the touching of a child by a parent, the consideration of whether the contact was for sexual gratification must take into account the nature and circumstances of the act, since the same conduct which constitutes an act of sexual abuse by a stranger could be a mere expression of affection on the part of a parent. Of course, certain kinds of behavior, such as genital penetration, will in any circumstance automatically give rise to an inference of sexual gratification (*see, e.g., Matter of Kathleen OO.*, 232 AD2d 784). The credible evidence here, viewed as a whole, fails to demonstrate that the respondent was guided by any desire for sexual gratification, but rather, points to the contrary inference.

■ Despite this rejection of the sexual abuse claim, the fact finding still required the court to take action to protect the child. This is because, notwithstanding the position of both respondent and the child's Law Guardian that respondent's conduct did not impair or imperil the child's emotional condition, the Family Court correctly concluded that the credible evidence established neglect as defined in Family Court Act § 1012 (f) (i) (B) and (h) by a preponderance of the evidence.

In order to find neglect, the evidence must demonstrate that the child's physical, mental or emotional condition is in imminent danger of becoming impaired as a result of the failure of the respondent to exercise a minimum degree of care in providing proper supervision or guardianship (*see*, Family Ct

Act § 1012 [f] [i] [B]). Here, the failure to exercise a minimum degree of care in providing proper supervision is demonstrated by the nature of respondent's conduct. Respondent's behavior was more than "unconventional" or "non-traditional". He is not just a parent who subscribed to a belief in the benefits of nudism. His conduct went well beyond the mere casual display of the body. Rather, as reflected in the findings of the Family Court, he actively encouraged his daughter to inordinately focus on his and her own genitalia and sexuality. As the Family Court noted, there was "an absence of appropriate physical boundaries in the respondent's behavior with [the child]."

The Family Court properly found, despite Dr. Kuchuk's contrary conclusion on this point, that the child had indeed engaged in sexually imitative behavior, and displayed "excessive and inappropriate associations between everyday occurrences and her own and others' genitals, including her father's." Indeed, substantial credible testimony, including that of the child's mother and stepfather, reported disturbances and anxieties on the child's part symptomatic of a serious problem, and reflected the kind of acting out that indicates a substantive impairment of the child's emotional well-being. Therefore, the court's conclusion that respondent's ill-advised conduct not only endangered, but in fact had already interfered with, his daughter's normal psychological development was fully supported.

We are aware that, as Dr. Kuchuk noted, the child displayed a positive emotional attachment to her father, as well as high intelligence and a pleasant personality. While these factors may provide support for Dr. Kuchuk's conclusions that there had been no sexual abuse and that the child was not suffering from any psychiatric disorder, they do not foreclose the possibility that the child was emotionally impaired as a result of parental conduct so lacking in appropriate limits and guidance, and was in danger of further harm, absent intervention. A child need not be suffering from a severe disorder for the court to conclude that she is impaired or in danger of impairment.

Finally, given the timing of events, it was not an improvident exercise of discretion for the court to find it more likely than not that the child's symptoms, including the disturbances and other anxieties she had exhibited, were the result of the previously described behavior of her father. We therefore affirm the finding of neglect.

■ We do not agree with respondent's suggestion that despite the finding, further action by the court is unnecessary for

the protection of the child (Family Ct Act § 1051 [c]). Notwithstanding the court's rejection of the allegation of sexual abuse, in view of the neglect finding the ultimate disposition sought by petitioner is still appropriate and necessary. Indeed, it was an improvident exercise of discretion for the Family Court to fail to direct any measures to ensure that the child would be protected against any repetition of the misconduct. Evidence offered at the dispositional hearing demonstrated a need to take action to protect the child. Even respondent's expert, Dr. Shuster, recognized the general view that what he termed respondent's poor judgment and nontraditional views had "interfaced poorly with [the child]'s developmental needs." The expert called by petitioner specifically explained that respondent lacks insight into the damaging consequences of his behavior.

Supervision of respondent by ACS is necessary, so that the agency may monitor the respondent's conduct. Additionally, supervision of all visits between respondent and the child, until the court is otherwise satisfied that the child is being protected, is necessary to ensure that respondent desists from further gross improprieties that could damage the child.

In the context of such supervision, we note that even in the absence of a diagnosis of a distinct psychiatric disorder, the Family Court possessed the authority to condition unsupervised visits upon respondent's participation in ongoing therapy geared toward modifying his behavior and his judgment (*see, Matter of James U. v Susan U.*, 125 AD2d 921), and its reversal of its own prior order in that regard was error. Further, it erred in failing to impose, through the child's 18th birthday, an order of protection prohibiting respondent from bathing nude with or sleeping nude with the child, or engaging in any other nudity in the child's presence (Family Court Act § 1056 [4]).

Accordingly, the final order of disposition of the Family Court, New York County (Richard Ross, J.), entered on or about March 23, 1998, which, following fact-finding orders entered on or about September 29, 1997 and on or about November 5, 1997, by the same court and Judge, found that respondent had neglected A.G., released the child to the custody of her mother without supervision by the Administration for Children's Services and continued visitation between respondent father and the child in accordance with the provisions of the parents' divorce decree and the order of protection issued March 28, 1998, should be modified, on the law and the facts, to the extent of (1) directing continued supervision of respondent by ACS for

a period of one year, (2) providing that respondent's visitation with the child be supervised pending further court order, and (3) adding an order of protection as set forth above, and as so modified, affirmed, without costs. The matter should be remanded to the Family Court to institute appropriate supervision procedures. The appeal from the fact-finding order of November 5, 1997 should be dismissed, without costs, as subsumed in the appeal from the final order of disposition.

ELLERIN, J. P., NARDELLI and RUBIN, JJ., concur.

Final order of disposition, Family Court, New York County, entered on or about March 23, 1998, modified, on the law and the facts, to the extent of (1) directing continued supervision of respondent by the Administration for Children's Services for a period of one year, (2) providing that respondent's visitation with the child be supervised pending further court order, and (3) adding an order of protection as set forth in this Court's opinion, and as so modified, affirmed, without costs and the matter remanded to Family Court to institute appropriate supervision procedures. The appeal from the fact-finding order, same court, entered on or about November 5, 1997, dismissed, without costs, as subsumed in the appeal from the final order of disposition.