Matter of A.B. (J.C.) (2025 NY Slip Op 52123(U))

[*1]

Matter of A.B. (J.C.)

2025 NY Slip Op 52123(U)

Decided on December 30, 2025

Family Court, Bronx County

Cruz, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on December 30, 2025
Family Court, Bronx County

In the Matter of A.B., V.B. and B.B., 
 Children Under Eighteen Years of Age Alleged to be Neglected by J.C., Respondent.

File No. XXXXX

Angel Cruz, J.

After a fact-finding hearing, at issue is whether a nine (9), eight (8) and six (6) year old's [FN1]
independent out of court statements are sufficiently corroborated to render them reliable and whether their purported exposure to pornographic material by a person legally responsible (PLR) and improper touching constitutes neglect. This court finds the children's out of court statements are corroborated and the PLR's actions constitute neglect within the meaning of FCA §1012. However, the allegations of bathroom voyeurism [FN2]
are dismissed, as the evidence presented is insufficient to make a finding.
On May 28, 2025, this case came in on "intake." The court arraigned Respondent J.C. (name omitted) and excluded him from the home with the issuance of a full-stay away order of protection and a limited access order to retrieve personal property.
The filed sworn neglect petition alleged that the Respondent J.C., considered himself the father of the subject children having told ACS, he "played a major role" in their rearing. The Respondent J.C. reported that he prepared meals for the subject children and brought them to school and actively contributed to the house both financially and emotionally. (See, Neglect Petition bearing docket Nos. NN-XXXXX,XX,XX-25). 
According to Child Protection Specialist (CPS) Stephanie Segura (hereinafter CPS Segura), the subject children refer to the Respondent as "dad." According to the petition, the Respondent, J.C. failed to provide the subject children with proper supervision and/or guardianship, in that:
On or about May 23, 2025, the subject children A.B., B.B. and V.B., were forensically interviewed at the Bronx Child Advocacy Center (CAC) and according to CPS Segura, [*2]the subject child A.B. reported that on at least one occasion the Respondent has "stared" at her while she was using the bathroom. According to A.B., Respondent looked at her "for a little too long" and it made her uncomfortable. According to CPS Segura, during the forensic interview, A.B. further disclosed that on one occasion the Respondent touched her on her thigh and her butt over her clothes and it made her uncomfortable. A.B. went on to disclose that the Respondent "sometimes watches inappropriate stuff." A.B. stated that the Respondent watches these videos in the living room on the TV or sometimes in his bedroom. According to A.B., the videos are of "the way two adults have children."In addition, the filed petition alleged, the subject child V.B. reported that one time she was on the couch with the Respondent, and she asked Respondent to tickle her, and she pointed to her vaginal area where the Respondent tickled her. According to V.B., this made her uncomfortable and she told the Respondent to stop. The Respondent said: "oh sorry". V.B. disclosed that the Respondent watches videos of "naked people". According to V.B., in one of the videos the naked woman had the naked man's private part in her mouth. V.B. reported that the Respondent watches the videos in the living room on the T.V.Likewise, the filed petition alleged, the subject child B.B. reported that the Respondent watches "inappropriate videos". When asked to describe the videos, B.B. took his hand and pointed towards his butt repeatedly. Boone further disclosed that the people in the videos were naked.According to 2022 NYPD criminal complaint and a domestic incident report (DIR) filed against the Respondent J.C. alleging in 2020 he inappropriately touched a 15-year-old child,[FN3]from a separate family and which allegations were not pursued as the child declined to cooperate. (See, Neglect Petition bearing docket Nos. NN-10962,63,64-25). * * *A Fact-Finding Hearing (FFH) was held on the following dates: October 7, 2025, November 7, 2025, and December 3, 2025.
On October 7, 2025, CPS Segura reiterated the allegations in the sworn petition and all three (3) video recordings of the CAC interviews were entered into evidence without objection.
Notably, CPS Segura was clear:
A: I spoke to them at their school.Q: And was anyone else present when you spoke to them at their school on May 23rd of 2025?A: No. It was all individually.Q: And so you spoke to the children each separately?A: Yes. (See "FFH" Transcript dated October 7, 2025, at page 17)

 * * * *

On cross, "CPS Segura" was asked:
Q: And during the CAC interview, A.B. — during the CAC interview of A.B., the interviewer asks if anyone has ever touched or seen her private parts, correct?A: Yes.Q: And in response to this question, A.B. stated once, twice, three times, four times, five times, correct?A: I don't remember.Q: And she not once stated who she was referring to, correct?A: I don't remember.Q: As part of your investigation, you spoke to NYPD Det. Kress, correct?A: Yes.Q: And you spoke to Det. Kress on or about May 23rd?A: Yes.Q: And earlier, you testified that Det. Kress was present for the CA--the CAC video?A: Yes.Q: And to your knowledge, criminal charges have not been brought against Respondent J.C.? A: No. no charges brought. (See "FFH" Transcript dated October 7, 2025, at page 21).

 * * * *

Regarding Respondent J.C. purportedly watching inappropriate videos with the children, and inappropriate touching, CPS Segura testified on cross examination as follows:
Q: And earlier, you testified that you had a phone call with Respondent J.C. May 27th?A: Yes.Q: And during that phone call, Respondent J.C. denied watching inappropriate videos with the children?A: Correct.Q: He explained to you that one time he was trying to watch TV and couldn't find the remote, correct?A: Yes.Q: And that he used his cell phone to airplay something?A: Yes.Q: And by accident, an inappropriate video popped up on the screen, correct?A: Yes.Q: Which he immediately turned off?A: Yes.Q: And when you spoke to Respondent J.C., he did not refuse to speak with you?A: No.Q: In fact, he voluntarily discussed the allegations with you?A: Yes.Q: He explained that if he ever touched A.B., it was on accident, correct?A: Yes.Q: He explained that when it if anything happened, he was helping A.B. get dressed?A: Yes.Q He expressed that he immediately apologized to A.B. after it happened A: Yes.Q: that it was not intentional?A: Yes.Q: And that he wanted to make sure that she looked presentable?A: Yes.

 (See, "FFH" Transcript dated October 7, 2025, Fact Finding, at pages 21- 22)
* * * *

Respondent J.C. testified on direct in relevant part as follows: 
Q: And what is your relationship to Ms.(omitted)?A: Boyfriend.Q: And what is your relationship to her children?A: Their stepfather.Q: And prior to the filing of the petition, how long were you living with Ms. B.(omitted) and her children?A: Four years.Q: And whose name is on the lease of the home that you shared with Ms. (omitted) ?A: Both I I, and Ms. (omitted).Q: And what type of home were you living in at that time?A: In an apartment.Q: And how many bedrooms were in that home?A: We have two bedrooms.Q: And how how many bathrooms were in the home?A: One bathroom.Q: And prior to May 20 and prior to May 28, 2025, who would use the bathroom?A: All of us. We would share the bathroom. (See, "FFH" Transcript dated October 7, 2025, at pages 33, 40)

 * * * *
On the issue of Respondent J.C. watching pornographic videos in the presence of the subject children, the following questions were posed on direct:
Q: Did the children have access to the television?A: The children would have to ask us before watching television.Q: Were there any times where the children were watching television when you and L.(name omitted) were not present?A: No.Q: Earlier, you heard the testimony from CPS Segura about the children stating that they saw inappropriate videos on the television. Can you tell us more about that?A: When the children requested to watch a new movie that was unobtainable on Netflix or YouTube, I proceeded to find the movie online.Q: And when when did this occur?A: That occurred September 2024.Q: And what were you trying to show the children?A: The movie in question was Robot, Call of Wild (sic).Q: And what, if anything else, happened while you were trying to show them the movie?A: Now, while casting this movie on this unknown website, I was unaware about the website displayed explicit material through ads.Q: Can you describe what it displayed?A: It was a GIF of rotating images of adult material.Q: And what kind of adult material?A: Fellatio and naked people.Q: And who was present in the room when that occurred?A: Me, B.B., V.B., and A.B. (the three children)Q: And how and how did you realize that something inappropriate had come up on the TV?A: I had my head down. The children pointed and yelled at me telling me there was something wrong on TV. Immediately, as I put my head up, I turned the TV off, and I told them that we would have to talk to L.(name omitted) before we continue watching TV.Q: What was going through your mind when you saw that on the screen?A: I was worried for my children's innocence. I was worried for myself, and I was worried for how the children would perceive what they saw.Q: Prior to this incident on September 2024, have you ever used that website before?A: Never again.Q: Prior to September 2024, had you ever previously used that website?A: No. I have never previously used that website before.Q: And since September 2024, have you used that website again?A: No, I have not.Q: And what, if anything, did you do after the video appeared on the TV?A: I proceeded to add parental controls as a password for the TV and encouraged the children to continue asking me and L. (name omitted) before watching TV or any programming.Q: And why did you speak with the B.(last name omitted) (sic) children?A: Because of what happened on TV.Q: And to your knowledge, has anything like this ever happened since September 2024?A: No.Q: And between the time you lived with L.(name omitted) and the children up until May 28, 2025, can you describe some of the daily responsibilities you had with the children?A: Me — L.(name omitted) and myself would wake up the children. I would pick out B.B.'s clothing while L.(name omitted) and the two girls changed in their rooms. I would make breakfast for the children before leaving the home. I would make sure everyone looks at their best before exiting to go to school. I would walk them to school or I would walk them to school on good days or take the bus on bad days.(See, F.F.H. Transcript dated October 7, 2025, at page 41-42).

 * * *
On Cross Respondent J.C. was asked:
Q: How long was this inappropriate video playing before you turn it off?

 A: Three seconds
Q: Can you describe what was happening in this video?A: It was a GIF image, rotating images and it came when we played the movie.Q: And what was happening in these rotating images?A: Fellatio and naked individuals.Q: How many individuals?A: TwoQ: And when did this incident occur?A: On September 2024Q: Had an incident like this ever occurred before?A: Never.Q: Did it ever occur after that?A: NeverQ: So, this was a one-time event, correct?A: Yes, it was.(See, F.F.H. Transcript dated November 10, 2025, at page 8-9, 15).

 * * *

 THE FORENSIC INTERVIEWS OF THE SUBJECT CHILDREN
The May 23, 2025, forensic interview conducted of the subject child A.B. was introduced into the record without objection. The interview begins with the counselor establishing clear ground rules with the nine (9) years old child attending the fourth grade. Specifically the child should correct the counselor if anything is stated incorrectly; how it is okay to say "I don't know" rather than guess an answer; how the child may ask for clarification when a question is confusing; the interviewer emphasized telling the truth about what really happened; how the child may use any words, including "bad words," without punishment; and how the child is encouraged to tell events from beginning to end and tested the difference between the truth and a lie. Following the ground rules, A.B. was asked the following:
Q: Uh, has there ever been a time where anyone has made you feel unsafe with those parts of your body or uncomfortable?A: Yes, there has. Okay.Q: Tell me about that.A: Um, for some reason, I can't think of anything right now.Q: Okay. Um, and tell me, uh, so has there ever been a time where anyone just touched or seen those parts of your body in a way that made you feel uncomfortable or just?A: - Once, twice, three times, four times, five times, six.Q: Uh- So who has made you feel uncomfortable with those parts of your body?A: Um... Can't, I'm not even allowed to say it.Q: You're allowed to say whatever you want in here. You're not gonna get in trouble for anything you say in here.A: Um, well, J.C. (Respondent).Q: Okay. Do you know who J.C. is?A: My mom's boyfriend.Q: Your mom's boyfriend?A: Yeah.Q: Okay. So in what way does he make you feel uncomfortable with those parts of your body?A: Listen, if I tell you, I just want a little be my ... I just told, uh, I was planning to do it in summer 'cause if J.C. leaves, then we'll have it all out 'cause we don't really have to go anywhere 'cause like, he usually takes me to school and stuff. And so, my mom doesn't know nothing about this. Like, I haven't told her yet, but just make sure when I tell you, just know that I haven't told her anything yet. Okay. Anything at all. Like, no, seriously. Yeah. If you ask her, she's probably gonna like, mm, no. So, I just, I'm just saying I'm scared.Q: Why are you suddenly scared?A: So, I gotta think about it. So, um ... Hey, hey. I'm thinking to myself.Q: The only people that are watching are the people that work with me, so no one in your-A: But I want the people who hear me.Q: I'm telling you, those people are the only people that work with me.A: I'm asking you directly 'cause I don't want it to reflect back, okay? Mm-hmm. Bye-bye. Don't watch me. Don't hear me.A: So, (Respondent's name omitted), my mom's boyfriend- Mm-hmm. ... um, they, he, uh, is sometimes watching inappropriate stuff.Q: Okay.A: He's like 32 or 36.Q: Okay. And, um, let's just say- If you tell me in my ear, I'm gonna say it out loud.A: Please don't. How adults have children, I guess.Q: Okay.A: Sometimes he watches that.Q: I don't think anyone will be mad at him for this.A: Okay. Sometimes he's in his room or sometimes, like, on his chair, his little gaming setup. It's got a big computer and Xbox and a controller and keyboard and mouse.Q: Oh, so I'm gonna say it out loud just because my helper can see or two, okay? If you wanna cover your ears when I say it, that's fine.A: Can you not say it too loud 'cause then I won't hear?Q: No, I won't. So, he watches inappropriate stuff like, uh, the way that two adults have children?A: Yeah.Q: Okay.A: Like how, um, one cell gets with the other cell. Yeah.Q: Okay.A: And, um ...Q: And you say sometimes he's in his room or at his like gaming setup that's like a computer and a chair?A: It's like in the living room where I watch TV. So sometimes it connects, it's random 'cause I said TV and then that pops up sometimes. I hope, it happened like two, three times.Q: Okay.A: And every time- So sometimes when he's at his gaming setup, it'll connect to the TV?Q: Yeah. OkayA: Or maybe in the rooms that I'm in.Q: Okay.A: I, I think he's being a little bit more cautious, but-Q: Has he said anything to you when that's been on or have you said anything to him?A: No.Q: Okay.A: Also, can I just tell you something?Q: Sure.A: Uh, I'm just thinking my mo- you know, my mom has nothing to do with this. She's like, this only happens when I have a day off or when she's at work or at another place. Okay?Q: That's okay. So you said it's happened two or three times?A: Yeah.Q: Do you remember the last time that something like that happened?A: Mm, I don't re- no. I don't know.

 * * *
Regarding the allegations of inappropriate touching, the interviewer asked the following questions:
Q: Okay. So other than these two things that you're telling me, has there ever been a time where he's, um, seen or touched those parts of your body in a way that made you feel uncomfortable?A: Yeah.Q: Okay, so tell me about that.A: Uh, he does, like demonstration, not like the r- a real masturbation. Sometimes he goes-Q: Okay.A: ... tou- touches my thighs, which I am uncomfortable with.Q: Okay. So he touches your thighs.A: Like butt buttons.Q: Okay. Can you... So you said your thigh, and you pointed here?A: My thighs. My thighs.Q: Okay. So what's happening before he touches you here?A: Um, nothing. He doesn't do that anymo- anymore. Well, I, I don't think. But my mom, she is so nice.Q: Okay. So I know we talked about three private parts, right?A: Yes. Here, here and here. No, he never touches me here.Q: Okay. Has he ever touched you here or here? Uh, I don't think here but, I guess yeah, like butt maybe.Q: Okay. So tell me about a time when that happened.A: I don't know. Maybe it was like...Q: Is that the same thing like when you're here?A: Mm-hmm.Q: Or is that something different?A: Like, on, uh, a bun.Q: A bun. A bun. A bun? Pretend this is a bun.A: Mm-hmm. This is a bun.Q: Oh, okay.A: It kind of turns into a bun.Q: So what, gotcha. I gotcha.A: And then, and then he would, m- c-, like-Q: Okay. ... pretend this is his hand and-Q: Okay. Yeah. What did he say when he did that?A: He didn't say anything. I- He was like, "Wee."Q: Did that happen one time or more, more than one time?A: No. More than once or something. Uh, maybe once. Yeah, maybe once. He did it once. And also, um, ever since those videos appeared, he's been, my brother has been acting weird. Mm-hmm. So, uh, this happened a few months ago. Mm-hmm. And I told my mom that B.B., let's p- pretend this table is me. Mm-hmm. He could... So when I was laying down, he usually, he comes to my bed every night. He went, when I was like everything, he we- came right next to me, face the same direction as me and went like this. With his leg over me.Q: Okay.A: Mm-hmm.Q: Is there anything else you wanna tell me about that might've happened? (pause)Q: I'm gonna go check in with my team to see if they have any other questions.

 (Interview concluded)* * *
The May 23, 2025, forensic interview with V.B., an eight (8) year-old child attending the second grade was conducted by a different interviewer than that of her sister, but began with an explanation of the same ground rules: that the Child can correct the counselor if anything is stated incorrectly; that it's okay to say "I don't know" rather than guess an answer; the Child may ask for clarification when a question is confusing; emphasize telling the truth about what really happened; the child may use any words, including "bad words," without punishment; child is encouraged to tell events from beginning to end and the difference between the truth and a lie.Following the ground rules, the child was asked the following:
Q: Um, are there any parts of your body that nobody is supposed to see or touch?A: Yeah. Yeah?Q: What do you call those parts of your body?A: Private parts. OK. Booty and pee-pee. Booty and pee-pee,Q: OK.A: Um, so how many parts is that? Two.Q: You have three?A: OK. My butt, my that, and that.Q: OK. So you said booty, pee-pee, and then what do you call this part?A: Booty. Booty.Q: OK. I just wanna make sure that we're talking about the same things, OK?Q: All righty, um, and you said you're here to talk about your, your dad. And you said his name is J.C.A: .. One time he did something inappropriate. So he was tickling me on the leg and then he accidentally, and then I, I think he did it on purpose and then he put his hand in my pants. And in the private part.Q: OK. So like I said, we s- we start from the beginning, right?A: OK.Q: Mm-hmm. Like you're telling me a story 'cause I wasn't there for that, so I wanna make sure I'm understanding everything that happened. OK? So can you start from the beginning?A: I did.Q: OK. So, you said that he was tickling you?A: On the leg.Q: On the leg? OK. And then, you had said that he accidentally, but then you said he did it on purpose.A: Yeah, I meant to say he did it on purpose.Q: You meant to say he did it on purpose?A: Mm-hmm.Q: What makes you think he did it on purpose?A: Hmm- 'Cause?Q: Because why?A: Well, I think he did it on accident because he wasn't looking, but still kind of makes me think-Q: So you think he did it on accident because he wasn't looking?A: Yeah.Q: Did- Accident or purpose. Accident or purpose.A: I kinda think it's purpose.Q: Purpose, OK. Even though he wasn't looking? So what were you wearing when he was tickling you? Do you remember?A: Shorts. Hmm? Shorts. Shorts.Q: OK. And you said he was tickling you on your leg. What part of your leg was he tickling you on?A: Here? (demonstrating)Q: OK. And then, you said you're not sure if it's on accident or on purpose, but you think it's on purpose, um, that he put his hand somewhere? Where did he put his hand?A: My private parts.Q: Your private part? OK. So when he was touching your private, was it over your clothes or under your clothes?A: U- under.Q: Under?A: Like he went inside, kind of.Q: He went inside? OK.A: So I didn't tell him to stop.Q: You told him to stop? OK. And what did he say?A: He said, "Oh, sorry."Q: OK. So probably ... Yeah. Wait, after, after you told him to stop, did he stop?A: Yeah. OK.Q: And he said, "I'm sorry"?A: He said, "Oh, sorry." Or something like that.Q: Oh, sorry. OK. Did he say anything to you while he was tickling you?A: No.Q: No? OK. OK, and has he ever did anything else like that?A: I don't know.Q: No?Q: And has J.C. (Respondent) ever made you feel unsafe in any other way or uncomfortable or has done anything else that's inappropriate?Q: OK. Tell me.A: So he used to watch, he used to watch these weird videos of naked people.Q: OK. Of what J.C.(Respondent) did.A: Goes with the boys. Goes with the boys. And s- the girl had her mouth in the private part of the boy.Q: OK.A: The girl had her mouth in the private part of the boy. It was so weird and I'm, uh, and, and it kept on showing on, uh, on the TV, so ...Q: OK. And where's the TV?A: In the living room.Q: In the living room? OK. And would you say anything to him when he was watching those videos? What would you say?A: I don't know.Q: Did he say anything to you when he was watching those videos?A: I don't know.Q: You don't know? Is that the clock?A: No.Q: Okay. And did he used to do that?A: Yeah.Q: When's the last time you saw him do that?A: Uh, like a year ago or something. Maybe a year ago or something?Q: Okay. And then, um, when he was tickling you and he touched your private, um, do you remember when that happened?A: Not really at all, I can't tell you.Q: You just know it happened?A: Yeah, I only know it happened.Q: Okay. Wait, what if it's his belly? Is it black?A: I think it's... Almost looks like a light blue. Um-Q: Oh, it's still black,A: I knew it.Q: Okay, fair enough. Alrighty, um, so other than the, when he tickled you and when we were watching those videos, have you ever done anything else that's inappropriate?A: No, I don't think so.Q: You don't... Okay. So I'm gonna take a quick break and I'm gonna go check in with my team to see if they have any other questions, okay? You okay to wait in here for me for a couple minutes? I'll be right back, okay? Hi, pal.A: Okay.Q: So while my team doesn't have any other questions for you, okay? I know I asked you a whole lot of questions. Do you have any questions for me?A: No. (Interview Concluded)

 * * *
THE LAWGenerally, in a child protective proceeding commenced under Article Ten of the Family Court Act, (FCA) the Petitioner herein — NYC Administration for Children Services (ACS) bears the burden of proving the allegations asserted in the petition by a preponderance of the evidence (FCA § 1046[b][i]). While the statute does not define the term "preponderance of the evidence," that standard of proof requires the court to determine whether the allegations in the petition are more probably true than not, as opposed to the more taxing "beyond a reasonable doubt" standard applied in the criminal term. (FCA § 1046).
As a threshold matter, ACS has established that the Respondent J.C. is a "Person Legally Responsible" (PLR) for the subject children: A.B., V.B, and B.B. as that term is defined by FCA § 1012(g). The 2021 addition of section 1012(g) to the FAC was a significant step in ensuring that a class of individuals who had access to children were held accountable for their actions which contributed to the abuse or neglect of those children even though not the biological parent. Id.[FN4]

FCA Section 1012(g) defines, in pertinent part, a person legally responsible (PLR) as any person responsible for the child's care at the relevant time alleged in the petition including any person continually or at regular intervals found in the same household as the child when the conduct of such person causes or contributes to the abuse or neglect of the child. Id.
The court in determining whether a Respondent is a PLR must consider such factors as the frequency and nature of the contact between the child and the Respondent, the nature and extent of control exercised by the Respondent over the child's environment, the duration of the Respondent's contact with the child, and Respondent's relationship to the child's parent.(See, In re Yolanda D., 88 NY2d 790 (1996); Matter of Janiyah T., 26 Misc 3d 1208(A)[Fam.Ct.N.Y.Co.2010]).
The Respondent J.C. conceded on direct that he had been in a relationship with the subject children's mother for over four (4) years; lived with the children, financially supported the children and took care of the children while the children's mother was at work.
Accordingly, this Court finds Respondent J.C. is a person legally responsible for the subject children in accord with FCA § 1012(g).
Aside from the testimony of the Child Protection Specialist, the forensic interviews of the subject children and Respondent J.C.'s testimony, there is the 2022 NYPD complaint, and the related Domestic Incident Report entered into the record without objection. The criminal complaint and DIR stem from a 2020 incident wherein in 2022 the 15-year-old child of Respondent J.C's former partner, asserted to her high school guidance counselor and to the [*3]responding NYPD officer that her mother's then boy-friend (the Respondent in this case) came into her room, laid next to her in bed, and started touching her breast, thighs, and vagina over her clothing. The child reported that Respondent J.C. would talk to her about sex, ask her if she was sexually active, speak about masturbation, and even instructed her how to do so using her hands. The criminal case was not prosecuted because the teenage victim ultimately declined to cooperate with law enforcement officials.
CPL §140.10(5) mandates a creation of a "Domestic Incident Report" (DIR) any time a law enforcement official responds to an incident involving allegations of violence within a household. 
Enacted in 1994 as part of the Family Protection and Domestic Violence Intervention Act of 1994,[FN5]
CPL §140.10(5) was part of a significant legislative attempt to address the surge of domestic violence and provide for the protection of victims of family violence. In addition to providing family violence victims with increased access to both the criminal and the family courts, the legislation also required that in responding to an allegation of family violence, a law enforcement officer prepare, file and translate a written report of the incident, on a form promulgated pursuant to Executive Law §837 including " 
...statements made by the victim and any witnesses." Id.
Since 1994, the judiciary has grappled with the hearsay nature of the statements contained within the DIR's, their use at family court fact finding hearings, and the corresponding duty to report requirement of the business record exception to the hearsay rule. (See, e.g., Matter of Dontay B. v. Octavia F., 81 AD3d 539 (1st Dept. 2011); Matter of Imani O. (Marcus O.), 91 AD3d 466 (1st Dept. 2012). 
At the conclusion of the fact-finding hearing, ACS invited this Court to consider the evidence of similar uncharged conduct of Respondent J.C. as alleged in the 2022 criminal complaint and DIR as proof of Respondent J.C.'s conduct in this matter.
This Court rejects ACS's invitation and finds the probative value of the 2022 NYPD criminal complaint and DIR is far outweighed by its prejudicial effect in this matter. Propensity evidence — using past acts to show someone acted similarly now is generally prohibited in New York, to prevent unfair "findings" based on past behavior rather than current acts of neglect. Family Courts have broad discretion to exclude evidence when its probative value is substantially outweighed by the danger of unfair prejudice. When confronted with evidence of Respondent's prior bad acts the Family Court is required to balance the probative value of the evidence against the prejudicial effects in order to ensure a fact finder is not unfairly influenced by evidence that if he did it once, he must have done it again. (See, e.g., People v Weinstein, 42 NY3d 439 [2024] (Rivera, J.) citing People v. Molineux, 168 NY 264 [1901]).
Again, in the family court: "all evidence must be relevant having any tendency to make the existence of any fact that is of consequence to the determination of the proceeding more probable or less probable than it would be without the evidence." (FCA §1046). A court may exclude relevant evidence if its probative value is outweighed by the danger that its admission would create undue prejudice to the party.
This court finds the 2022 NYPD criminal complaint and related DIR were only submitted [*4]for the purpose of propensity and the flowing prejudicial effect to Respondent J.C. This court will exclude that evidence and not consider it.
Proceedings in the family court are civil in nature and a finding of abuse or neglect need only be supported by a preponderance of the evidence (FCA § 1046[b][i]). In Article 10 proceedings where the primary evidence of the neglect allegation consists of "out-of-court" statements made by minor children to a CPS worker and repeated to the forensic interviewer, corroboration is required. (FCA § 1046 [a][vi]; Matter of Nicole V., 71 NY2d 112, 124 [1987]). 
For ACS to satisfy its burden of proof the testimony of the children at the fact-finding hearing is not necessary to make a finding of neglect. The Family Court has considerable discretion in deciding whether out-of-court statements made by children have been reliably corroborated and whether the record supports a finding of abuse or neglect (Matter of Nicole V., 71 NY2d at 119 [1987]).
The New York State Legislature in passing Family Court Act § 1046 [a][vi], envisioned a broad, flexible standard of corroboration for a child's out-of-court statements. The Court of Appeals has long held corroboration of a child's out of court statements is not required because statements of children are generally unreliable but rather, corroboration is required because the out-of-court statements are hearsay, and the statute requires some further evidence to establish their reliability. (Matter of Nicole V., 71 NY2d at 118 [1987]).
Corroboration is defined as any evidence tending to support the child's out-of-court statement. A relatively low degree of corroboration is required however, and independent statements by children requiring corroboration may corroborate each other. The Legislature has made clear that the corroboration requirements of the criminal law are not applicable in Family Court Article 10 proceedings. (Matter of Christina F., 74 NY2d 532, 536 [1989]). "[A]lthough the mere repetition of an accusation does not, by itself, provide sufficient corroboration, some degree of corroboration can be found in the consistency of the out-of-court repetitions' ." Matter of Osher W. (Moshe W.), 198 AD3d 904, 907 [2d Dept 2021]; Matter of Christina F., 74 NY2d at 536, quoting FCA § 1046[a][vi] [emphasis added]).
Although the out-of-court statements of a child relating to allegations of abuse or neglect must be corroborated to make a finding, independent statements requiring corroboration may corroborate each other (Matter of Nicole V., 71 NY2d at 124, citing with approval Matter of Cindy JJ., 105 AD2d 189 (3rd Dept. 1983) [admission of respondent father that he had sexual intercourse with his oldest daughter corroborates out-of-court statements by the three younger children against them despite respondent's denial of such sexual contact with those children]; see also Matter of Jahkell SS.(Victoria SS.), 237 AD3d 1416 (3rd Dept. 2025).
The court is cognizant that the reliability of the children's out of court statements relating to the neglect or abuse, it's corroboration, as well as issues of credibility, are all matters entrusted to the sound discretion of the trial court subject to abuse of its discretion review.
This Court has had ample opportunity to observe the demeanor and credibility of each witness in this case and recognize the underlying allegations have not been witnessed by anyone but the Respondent J.C. - who was subjected to cross examination, and the out-of-court statements of the three minor children. Accordingly, the Court credits only portions of the Respondent J.C.'s testimony and finds other portions of his testimony to be self-serving and incredible.
A finding of neglect is warranted when a parent allows the child to be harmed or placed in substantial risk of harm (FCA § 1012[f][i]). A parent or PLR, who fails to protect a child, and [*5]consequently places the child at imminent risk of harm, demonstrates a fundamental defect in understanding the duties and obligations of parenthood and creates an atmosphere detrimental to the physical, mental, and emotion well-being of the child.
This court finds Respondent J.C. did expose the subject children to pornographic materials and did engage in inappropriate touching of the children A.B. and V.B. The court finds the out-of-court statements of A.B. and V.B. cross corroborated each other and are each sufficiently reliable to credit the assertions made therein. This court finds the consistent statements of the subject children were also corroborated by the Respondent J.C. himself in that Respondent J.C. admitted he exposed the subject children to pornography, albeit according to him, accidentally. This court rejects that portion of Respondent's testimony that the occurrence was a one-time three (3) second accidental technical cell phone defect event back in September 2024. The children's descriptions of the sexual acts depicted establish the exposure was far more expansive than Respondent J.C. accounted for, and possessing sexual knowledge not age appropriate.
In fact, since the exposure, A.B. noted that her little brother had since has been "acting weird". This court credits the A.B.'s statements, partially corroborated by the Respondent J.C. himself, and cross-corroborated by her siblings. The detail of the sexual acts in the pornographic videos played on the living room and bedroom televisions - the mechanics of the sexual acts depicted therein — was knowledge not generally known to children of the ages of 9, 8, and 6 years old — and directly contradicts the Respondent J.C.'s assertion of a one-time accidental event.[FN6]

As it relates to impropriate touching: the 9-year-old A.B. disclosed it happened when the mother was at work — feeling unsafe around the Respondent J.C. and touched the child's thighs and buttocks without permission. A.B. acknowledged the events she related to the forensic interviewer had happened, and the fact that A.B. could not recall the specifics dates does not detract from the statement's reliability. This court finds the child's inability to recall dates is consistent with her age and potentially the product of fear. In fact, the child explained that she had not told her mother out of fear. Equally clear to this court, is the finding that Respondent touched the child's thighs and butt ("butt buttons") without any apparent reason. A.B. felt uncomfortable and reports it happened once, possibly twice and Respondent J.C. did not speak during the touching, and there was no other apparent preceding activity.
During the forensic interview of eight (8) year old V.B. - she as well confirmed viewing "weird videos of naked people" with a girl who had a boy's private part in her mouth but also disclosed inappropriate touching by Respondent. Specifically, V.B. relates one incident where Respondent J.C. tickled the child's leg and then placed his hand under her shorts onto her "private parts." V.B. was clear the "touch" was under her clothes and once she told Respondent J.C. to stop, Respondent said "Oh, sorry" and stopped immediately.
The fact that V.B. vacillated between whether the touching was intentional ("on purpose" even though Respondent wasn't looking) or by accident does not detract from its occurrence. Nor does the fact that V.B. was unable to provide the exact timing of the tickling incident, could not recall the date or details beyond that it happened or that there are no other known instances of inappropriate behavior by the Respondent J.C., or the absence of any criminal arrests detract from her reliability.[FN7]
These seemingly innocent events when considered as a whole have the ear-marks of "grooming" techniques — the slow process by which an abuser normalizes that conduct in preparation for future exploitation.[FN8]

The record supports a finding that Respondent J.C. committed acts which constitute neglect against the subject children. Based on the totality of the evidence this court concludes the exposure to pornographic videos was not an isolated incident as Respondent claimed. Likewise, the evidence of improper touching demonstrates such an impaired level of parental judgment as to create a substantial risk of harm for any child in his care.
To the extent this court renders a finding of neglect on the allegations of exposing the children to pornographic videos and the allegations of improper touching, the court dismisses the allegations of bathroom voyeurism as there is insufficient evidence in the record to support such a finding. Although A.B. stated she felt uncomfortable when Respondent J.C. on at least one occasion stared at her while using the bathroom for a "little too long", that statement alone is not sufficient to support a finding of neglect. Therefore, that portion of the petition is dismissed.
The parties are directed to email my court attorney to schedule a dispositional hearing.
This constitutes the decision and order of the court.
Dated: December 30, 2025Bronx, NYHON. ANGEL CRUZ, A.J.F.C.

Footnotes

Footnote 1:Because this case involves children and sensitive matters, this court will use initials to refer to the children. A.B. is a 9-year-old child born on xx xx, 2016; V.B. is an 8-year-old child born on xx xx, 2017, and B.B. is a 6-year-old child born on xx xx, 2019.

Footnote 2:Merriam-Webster dictionary defines a person who gains pleasure from observing others in private activities, such as using the bathroom is a "voyeur". 
See, voyeur | Definition of voyeur by Webster's Online Dictionary (last accessed Dec. 28, 2025)

Footnote 3:The 2022 NYPD criminal complaint and DIR was filed because Ms. F. (age 15) told her school counsel that back in 2020 Respondent J.C. inappropriately touched her and spoke about sex and masturbation. The complaint was not pursued because the 15 yrs old did not was to purse the criminal case and did not cooperate.

Footnote 4:Family Court Act§ 1012(g) was added to the FCA by New York Laws 2021, ch. 97, effective April 6, 2021.
Footnote 5:See, NY Sessions Law. 1994 chs. 222,224. It also requires that those records be maintained for a minimum of four (4) years. 

Footnote 6:However, age-inappropriate knowledge of sexual matters, standing alone, is insufficient to corroborate a child's out-of-court statements concerning sexual abuse (see e.g. Matter of Zamir F. [Ricardo B.], 193 AD3d 932, 934—935; Matter of Carmellah Z. [Casey V.], 177 AD3d 1364, 1367; Matter of Kyle D. [Dwayne D.], 138 AD3d 835, 835—836; Matter of Brittany K., 308 AD2d 585, 586; Matter of Victoria H., 255 AD2d 442, 443; Matter of Kelly F., 175 AD2d 803, 804).

Footnote 7:Matter of A.G., 253 AD2d 318 (1ST Dept. 2024)(Courts have recognized that children often have greater difficulty than adults in providing precise dates of incidents for a variety of reasons); Matter of Chloe L. (Samantha L.) 200 AD3d 1234 ( 3rd Dept 2021) (appellate division reverse that portion of the trial court's dismissal alleging neglect on allegations Respondent showed the child pornographic videos in that child offered equivocal testimony regarding the specific months or dates and the failure to provide the specific date did not wholly undermine the court's finding that Respondent showed the child pornographic videos, and the court erred in dismissing that portion of the amended petition).

Footnote 8:(See, How Sexual Predators Use Grooming Techniques to Prey on Victims' Trust - SJC)(last accessed Dec. 28, 2025)